# Exhibit 5

Gateley / LEGAL

Grosvenor Law
27 Grosvenor Street
Mayfair
London
W1K 4QP

Date  16 December 2020

Our ref:
**4426\43533667.1**\123241.823\4426D

Your ref: BM/AKS/NEW3.689

Direct tel:   +44 (0) 207 653 1790

E-mail:  jovita.vassallo@gateleylegal.com

BY EMAIL AND POST
Dan.morrison@grosvenorlaw.com
Akram.Shalabi@grosvenorlaw.com

<u>**LETTER BEFORE CLAIM**</u>

Dear All

**Our clients: Mr Ghanem Nuseibeh & Cornerstone Global Associates Ltd
YOUR CLIENT: Diligence Global Business Intelligence SA**

1.      We now act for Mr Ghanem Nuseibeh and Cornerstone Global Associates (**Cornerstone**). This is a Letter Before Claim (sent pursuant to the requirements of the *Practice Direction: Pre-Action Conduct and Protocols*) to put your client, Diligence Global Business Intelligence SA (**Diligence**), on notice of a claim against it for the disclosure of information pursuant to the principle established in *Norwich Pharmacal Co v Commissioners of Customs and Excise* [1974] AC 133. If you fail to provide an adequate response to this letter in 21 days by 6 January 2021 our clients will issue a claim against Diligence without further notice to you.

2.      This letter also includes requests which constitute the exercise of Mr Nuseibeh's data subject rights under the General Data Protection Regulation (**GDPR**). Pursuant to Article 12(2) GDPR your client is required to provide information on action taken on these requests without undue delay and in any event within one month of the date of this letter and by no later than 16 January 2021.

**BACKGROUND**

3.      Cornerstone is a boutique UK-based strategy and management consultancy which produces impartial reports on a wide range of economic and political issues. Mr Nuseibeh, the co-founder of Cornerstone, has a significant public profile and a respected commentator on a wide range of issues, particularly in relation to the Middle East. Mr Nuseibeh's non-profit work includes being Chairman of Muslims Against Anti-Semitism and, amongst other things, he has been a prominent critic of the Muslim Brotherhood, whose leadership is based in Qatar.

4.      In October 2017, Cornerstone produced a report entitled *"Qatar in focus: Is the FIFA World Cup 2022 in danger?"*. This report was critical of Qatar and, it appears, led entities in Qatar linked to Qatar FIFA 2020 projects, to commission investigations into our clients.

1 Paternoster Square
London EC4M 7DX
DX 824 London City
020 7653 1600

gateleylegal.com

Gateley Legal is the business name of Gateley Plc, a public limited company incorporated in England and Wales. Registered number: 9310187. VAT Registered Number: GB 991 2809 90. Registered office: One Eleven Edmund Street, Birmingham, B3 2HJ.  Authorised and regulated by the Solicitors Regulation Authority, SRA number 621996.



5.      As explained in previous correspondence from Gateley Tweed, our clients have been subjected to a long-running campaign of covert surveillance, hacking/equipment interference and other interference with their correspondence. The following examples or manifestations of such activities are only the ones of which they are aware. Given that these activities are self-evidently designed not to be detected, the obvious inference is that there are many more such examples. Indeed, knowing that such instances are likely to be only the tip of the iceberg, is a cause of serious anxiety for Mr Nuseibeh.

5.1     In 2018, Mr Nuseibeh discovered that journalists had been provided with his email correspondence and documents. It was apparent from his conversations with these journalists that our clients' email accounts and/or their electronic devices had been hacked.

5.2     In February 2019, Mr Nuseibeh's mailbox in his apartment building was broken into. The perpetrator wore a black balaclava and removed letters from this mailbox. No other mailboxes in the building were targeted.

5.3     In September 2019, Mr Nuseibeh noticed that several people were taking photographs of him in a London hotel after he emerged from a business meeting.

5.4     In December 2019, a private document which was sent by our clients via the WhatsApp messaging service was published on a website in the context of a story which attacked them. This document was unlawfully obtained.

5.5     In July 2020, Cornerstone moved into a London Office in a building at 21 Arlington Street, London SW1A 1RN (**21 Arlington Street**). From 1 August 2020, an individual named Verity Horner rented an office at 21 Arlington Street, having indicated that it was for her business. The rent for this office was likely to be in the region of £40,000 per annum. Ms Horner provided access to an individual who had indicated that his name was "Leslie".  On 11 September 2020, it was discovered that "Leslie" had placed a recording device outside Cornerstone's office door at 21 Arlington Street. This was reported to the Counter Terrorism Unit within the Metropolitan Police.

5.6     Hereinafter the matters set out at paragraphs 5.1are referred to as "**the Campaign**".

6.      On 3 November, you stated that Diligence undertook work on behalf of a client *"to conduct an investigation into allegations of bribery, corruption and related money laundering relevant to the Qatar World Cup 2022"*. You further stated that your client was asked to *"investigate allegations that a British Member of Parliament had received undeclared monies from a UK based individual in order to influence policy…"* Your letter confirmed that as part of this investigation, Diligence placed our clients under surveillance; Diligence admitted that one of its operatives *"placed a recording device behind a fire extinguisher in a public area outside of an office located at 21 Arlington Street, London"*. You stated that Diligence placed the device there *"for the purposes of evidence-gathering [sic] in relation to a sensitive enquiry"*. We assume that to be a reference to the investigation to which Diligence was conducting in relation to Qatar 2022.

7.      For the reasons explained below, Diligence's client (**Ultimate Client**) has acted unlawfully in pursuing this campaign against our clients. Our clients reserve their position as to whether Diligence has itself acted lawfully in respect of its role the Campaign, either alone or pursuant to a common design with the Ultimate Client.

PROPOSED APPLICATION FOR A NORWICH PHARMACAL ORDER

8.      Diligence is required to provide the following information: (a) the full name, postal address and contact details of the Ultimate Client; (b) confirmation as to whether the Ultimate Client has designated a representative in the EU/EEA for the purposes of Article 27 of the GDPR (**the Article 27 Representative**) and, if so, the name and contact details of the representative (**the Information**).

9.      If you refuse to provide the Information, our clients will make an application to the Court for a Norwich Pharmacal relief against Diligence. On that application they shall seek an order requiring that Diligence produce a witness statement containing the Information set out at paragraph 8 of this letter.

10.     The requirements of Norwich Pharmacal Relief were recently summarised by Saini J in *Collier v Bennett* [2020] 4 WLR 116 at [35]:

43533667.1

*"(i) The applicant has to demonstrate a good arguable case that a form of legally recognised wrong has been committed against them by a person …*

*(ii)   The respondent to the application must be mixed up in so as to have facilitated the wrongdoing ...*
*(iii)   The respondent to the application must be able, or likely to be able, to provide the information or documents necessary to enable the ultimate wrongdoer to be pursued ...*

*(iv)   Requiring disclosure from the respondent is an appropriate and proportionate response in all the circumstances of the case, bearing in mind the exceptional but flexible nature of the jurisdiction ("the Overall Justice Condition")".*

11.    The acts set out at paragraphs 3 to 6 above are plainly part of an orchestrated operation by the Ultimate Client against our clients. There is a good arguable case that these acts (taken alone or in combination) amounted to: harassment; a misuse of private information; and breaches of confidence.

12.    The Ultimate Client has, by its agents, engaged in a course of conduct amounting to the harassment of Mr Nuseibeh, contrary to section 3 of the *Protection from Harassment Act 1997*. The Campaign has targeted him both directly and indirectly and it has involved conduct which is properly to be regarded as oppressive and unreasonable. There are strong grounds to believe that the Campaign has included following and photographing Mr Nuseibeh, interfering with his correspondence, and hacking his electronic communications and/or devices. We infer that Mr Nuseibeh is unaware of all the conduct forming part of the Campaign. You will be aware that in the recent judgment in *Gerrard v ENRC and Diligence International LLC* [2020] EWHC 3241 (QB), the High Court held that surveillance which is intended to be undetected can amount to harassment, with the Judge noting that it may be "*equally or even more upsetting for the victim to be … monitored and spied upon in a manner that the victim is unable to detect*" (at [91] – [94]).  A reasonable person in the position of the Ultimate Client would think the Campaign amounted to harassment (including on the basis of its causing alarm and/or distress to the subject). While there is no requirement to show the conduct in fact caused Mr Nuseibeh alarm or distress, or even that such harm was/is foreseeable – the Campaign has caused and continues to cause Mr Nuseibeh serious distress, alarm and anxiety.

13.    The Ultimate Client has, through its agents, committed the tort of misuse of private information by accessing email accounts and other electronic communications, and/or the electronic systems of Mr Nuseibeh. He has a reasonable expectation that his email and messaging accounts would not be the subject of unauthorised access or intrusion; and any correspondence or information accessed or obtained from such accounts would be not be further used. It is well established that the right to private life extends to activities and correspondence of a business or professional nature (e.g., *Barbulescu v Romania* (GC) [2017] IRLR 1032). There can be no justification for such activity which would outweigh Mr Nuseibeh's *Article 8 ECHR* rights in the circumstances.

14.    The Ultimate Client has, through its agents, accessed information held in our clients' email accounts, messaging accounts, and/or their electronic systems. Such accounts contain information which is confidential to Cornerstone, Mr Nuseibeh and (where relevant) their clients. Accessing or obtaining information which the person undertaking such access knows or ought to know is confidential constitutes a breach of confidence (see e.g., *Imerman v Tchenguiz* [2011] Fam 116 at [68] – [69]). Any further use of such information is likely to constitute a discrete, actionable, breach of confidence.

15.    The Ultimate Client has also breached Mr Nuseibeh's data protection rights in that his personal data has not been lawfully processed in breach of Article 5(1)(a) of the GDPR in that it was collected by the unlawful means outlined above.

16.    Diligence has become mixed up in the above wrongdoing, so as to have facilitated it. It has done so by undertaking surveillance against our clients on behalf of the Ultimate Client as part of this Campaign. While our client's reserve their position as to whether Diligence was aware of the wrongdoing or any part thereof, there is no need for Diligence to have had knowledge of the wrongdoing on an application for Norwich Pharmacal relief (*R (Mohamed)*

*v Secretary of State for Foreign and Commonwealth Affairs (No 1)* [2009] 1 WLR 2579 at [72]).

17. Diligence plainly has the information which our clients are seeking (as set out above) because it was instructed by the Ultimate Client. As to information sought concerning the Ultimate Client's Article 27 Representative, this is information which Diligence could readily obtain if it does not already have it. To the extent that Diligence takes the position that it does not have any of the information our clients are seeking, please explain why not.

18. Should an application for a Norwich Pharmacal Order prove to be necessary, we shall contend that requiring disclosure of the Information by Diligence is an appropriate and proportionate response in all the circumstances of the case. Our clients are the victims of a sustained and oppressive campaign of covert surveillance. The Campaign is highly intrusive of Mr Nuseibeh's right to a privacy (including in respect of his private information, family life and correspondence) and has also involved the misuse of information which is confidential to him and/or Cornerstone. Without the limited information our clients seek from Diligence, they shall have no way of identifying and taking action against whoever is behind the unlawful Campaign.

**REQUESTS / EXERCISE OF RIGHTS UNDER THE GDPR**

19. You have confirmed that Diligence was instructed to investigate Mr Nuseibeh and to place him under surveillance. These activities necessarily included the processing of Mr Nuseibeh's personal data within the meaning of Article 4(2) GDPR.  Although, Diligence is based in Switzerland such processing activities fall within the scope of the GDPR on the basis that they relate to the monitoring of a data subject's behaviour which took place within the EU, within the meaning of Article 3(2)(b) GDPR. Accordingly, Diligence is required to comply with the duties and data subject rights contained in the GDPR.

20. Diligence did not obtain Mr Nuseibeh's personal data from him. Accordingly, Diligence was required to provide him with the information set out at Article 14(1) and (2) GDPR, in accordance with the provisions of Article 14(3), i.e., within one month of obtaining the data and/or within one month disclosing such data to another recipient, which would include the Ultimate Client. It has not done so.

21. Please now provide all of this information without further delay (for the avoidance of doubt the request for this information is also made under Article 15 GPDR); this should include but is not limited to:

21.1 An explanation as to the purposes of the processing for which the personal data are intended as well as the legal basis for the processing.

21.2 Any recipients to whom Mr Nuseibeh's data has been or will be disclosed.

21.3 An explanation as to whether Diligence has transferred or intends to transfer his personal data to any recipient in a third country and, if so, an explanation as to the appropriate or suitable safeguards attaching to any such transfer.

21.4 To the extent that Diligence relies on Article 6(1)(f) as the legal basis for the processing of Mr Nuseibeh's personal data, an explanation of the legitimate interests upon which it purports to rely.

21.5 The source(s) from which the personal data originate.

22. Pursuant to his rights under Article 15 GDPR, Mr Nuseibeh seeks a copy of all personal data Diligence is processing of which Mr Nuseibeh is the subject. We are authorised to make this request and receive copies of such personal data on his behalf.

23. We hereby give notice of Mr Nuseibeh exercising his right to object (pursuant to Article 21(1) GDPR) to the processing of any of his personal data by Diligence. The processing of data gathered in the context of a purported investigation undertaken at the behest of an unidentified entity and through the use of surreptitious surveillance measures is inherently damaging to Mr Nuseibeh's rights, interests and freedoms. Most obviously, such activity constitutes a serious intrusion into Mr Nuseibeh's private life. Such surveillance has caused him significant distress. To the extent that Diligence seeks to rely on any *"compelling legitimate grounds"* for the processing of Mr Nuseibeh's data, please identify them and explain why Diligence considers any such grounds override his rights and interests.

24.   On the basis of Mr Nuseibeh having exercised his right to object to the processing of his personal data by Diligence, we hereby give notice of his exercising his right to obtain a restriction on processing pursuant to Article 18(1)(d) GDPR. With the exception of the storage of the data, Diligence is therefore required not to process his data other than for the defence of legal claims. Please confirm that Diligence has placed this restriction on the processing.

25.   Data processing of the nature conducted by Diligence (including through use of a recording device) pursuant to the investigation it is has been undertaking (or is undertaking) for the Ultimate Client is plainly processing that is *"likely to result in a high risk to the rights and freedoms of natural persons"*. That is because, among other matters, it appears that processing operations involve tracking an individual's behaviour and because the processing is what ICO has labelled "invisible processing" (data was not obtained directly from Mr Nuseibeh and Diligence has not complied with Article 14 GDPR).[1] Accordingly, pursuant to Article 35(1) GDPR, Diligence was required to carry out a Data Protection Impact Assessment (**DPIA**) prior to these processing operations. Please provide a full explanation as to what steps, if any, Diligence has taken to comply with its obligations under Article 35 GDPR, and supply a copy of any DPIA that has been produced.

26.   We infer that the Ultimate Client is outside the European Economic Area. That being so, please (a) explain the legal basis for Diligence's transferring Mr Nuseibeh's personal data to the Ultimate Client in a third country; and (b) confirm whether Diligence contends that such transfers comply with the conditions laid down in Chapter 5 of the GDPR and, if so, provide an explanation as to how these conditions are said to be satisfied.

27.   As Diligence is monitoring the behaviour of data subjects in the EU it must, under the provisions of Article 27(1), have its own designated representative in the EU. Please provide the name and contact details of that representative. Note that this a separate request from that made in respect of the Ultimate Client's Article 27 Representative.

28.   If Diligence fails to comply with the above requests under the GDPR then Mr Nuseibeh client will apply to Court under section 167 of Data Protection 2018 for appropriate compliance orders.

**DEADLINE FOR RESPONSE**

29.   Please provide a response within 14 days and by no later than 12pm on 30 December 2020 confirming whether Diligence intends to provide the Information set out at paragraph 8 and, if not, please give reasons any such refusal. If Diligence intends to comply then we expect to receive the Information within 21 days by 6 January 2021. If we do not receive the Information by this date or, if you inform us that Diligence does not intend to comply with this request, we have instructions to issue a claim for Norwich Pharmacal relief without further notice to you.

30.   We expect a response in respect of Mr Nuseibeh's exercise of his rights under the GDPR without undue delay and in any event within one month of the date of this letter being 16 January 2020.

31.   Please confirm that Diligence has taken steps to preserve all emails and other documents concerning our clients.

Yours faithfully

Gateley Legal

Gateley Legal

---

[1]   We refer you to the Information Commissioner's Guidance on this: https://ico.org.uk/for-organisations/guide-to-data-protection/guide-to-the-general-data-protection-regulation-gdpr/data-protection-impact-assessments-dpias/when-do-we-need-to-do-a-dpia/

43533667.1